1

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   CATHERINE GRAVITT and TRAVIS      )
    GRAVITT,                          )
4                                     )
                   Plaintiffs,        )
5                                     )
    -vs-                              )  Case No. 17 C 5428
6                                     )
    MENTOR WORLDWIDE, LLC, a          )
7   foreign corporation,             )  Chicago, Illinois
                                      )  August 23, 2018
8                  Defendant.         )  9:00 a.m.

9                TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE GARY FEINERMAN
10
    APPEARANCES:
11
    For the Plaintiffs:       DOGALI LAW GROUP, P.A.
12                            BY:  MR. ANDY DOGALI
                              401 East Jackson Street
13                            Tampa, Florida  33602
                              (813) 289-0700
14
                              LENZE LAWYERS, PLC
15                            BY:  MS. JENNIFER A. LENZE
                              1300 Highland Avenue, Suite 207
16                            Manhattan Beach, California  90266
                              (310) 322-8800
17
    For the Defendant:        TUCKER ELLIS, LLP
18                            BY:  MR. DUSTIN B. RAWLIN
                                   MS. BRITTANY L. WEISS
19                            950 Main Avenue, Suite 1100
                              Cleveland, Ohio  44113
20                            (216) 592-5000

21
    Court Reporter:
22
                    CHARLES R. ZANDI, CSR, RPR, FCRR
23                     Official Court Reporter
                    United States District Court
24          219 South Dearborn Street, Room 2128
                    Chicago, Illinois  60604
25              Telephone:   (312) 435-5387
          email:  Charles_zandi@ilnd.uscourts.gov

1   (Proceedings heard in open court:)

2          THE CLERK:  17 C 5428, Gravitt versus Mentor

3   Worldwide.

4          MS. WEISS:  Good morning, your Honor.  Brittany Weiss

5   on behalf of defendant Mentor.  One of our other attorneys

6   should be here shortly.  I would ask that we could pass until

7   he --

8          THE COURT:  Do you mind?

9          MS. LENZE:  No, not at all.

10    (Recess had.)

11          THE CLERK:  17 C 5428, Gravitt versus Mentor

12   Worldwide.

13          MS. LENZE:  Good morning, your Honor.  Jennifer Lenze

14   on behalf of the plaintiffs.

15          THE COURT:  So, who else do we have?

16          MR. DOGALI:  Also Andy Dogali from Tampa, Florida,

17   for the plaintiffs.

18          MR. RAWLIN:  And Dustin Rawlin for defendant Mentor

19   Worldwide, LLC.

20          MS. WEISS:  Brittany Weiss for defendant Mentor

21   Worldwide.

22          THE COURT:  Good morning.  So, we're here for a

23   status hearing.  I think I entered an order saying that the

24   defendant had to comply with the document production order by

25   August 8th.  Did that all go according to plan?

1    MR. RAWLIN:  It did, your Honor.  We did not find any

2  documents, except one, that was attorney-client privileged.

3  We produced a privileged log to the plaintiff.  We did some

4  extensive searching of the company that entailed quite a bit

5  of locations, employees, contacted ex-employees, contacted

6  ex-law firms to try and locate documents related to that

7  issue, in part because we felt that those documents would

8  exonerate Mentor.

9    THE COURT:  Even if they didn't, you'd still have to

10  find them.

11    MR. RAWLIN:  Absolutely.  And we asked for --

12  actually, if you remember, your Honor, we asked for an

13  extension of time to continue to look for them.  We found

14  exactly one, which is clearly privileged, and we've given the

15  plaintiffs a privileged log.

16    We have identified the ex-employee that we believe

17  wrote the letter to the FDA back in 2006; but other than that,

18  we have not found anything else that's responsive.

19    THE COURT:  Okay.  So, you found one document that

20  was privileged, and you served a privileged log?

21    MR. RAWLIN:  Correct.

22    MR. DOGALI:  Your Honor, that production requires

23  further analysis.  Mentor produced quite a lot of

24  documentation, much of it more public information than

25  expected, but -- and the form of that production requires

4

1  analysis as well.

2      But they produced a lot of -- thousands of pages of

3  records that go back decades; and for some reason, these

4  particular files from 2005 and '6 and perhaps thereafter

5  cannot be found.  It's impossible that Mentor did not believe

6  or understand that whistleblowers might be material witnesses

7  some day.  So, for the personnel files, for example, of these

8  people to have disappeared while all kinds of other documents

9  were not destroyed in the ordinary course that relate to these

10  issues is going to require some investigation.

11      I'm very surprised to find that there is only one

12  document located and zero produced.

13      MR. RAWLIN:  Your Honor --

14      MR. DOGALI:  With respect to the broader production,

15  that's an issue as well, your Honor.  I don't want to ambush

16  opposing counsel, because we haven't really addressed it very

17  much; but we got 28,000 pages of documents produced as simple

18  .pdf images, which is very unusual.  Ordinarily, including in

19  this district, it would be TIFF files or native format at

20  least, but Mentor had to go out of its way to strip all the

21  metadata out before giving it to us.

22      THE COURT:  Okay.  Is this something that's been

23  presented in a motion yet?

24      MR. DOGALI:  No, sir.

25      THE COURT:  Okay.  Then let's keep one ball in the

1 air at a time.

2         MR. DOGALI:  It may only go to the issue of

3 scheduling, your Honor, when you asked how discovery is

4 going.

5         THE COURT:  So, you say it would warrant further

6 investigation.  What do you have in mind?

7         MR. DOGALI:  I need to perform -- first of all, the

8 broader production without metadata prevents any search of

9 anything by us to determine --

10         THE COURT:  Again, is this something that -- is that

11 something that we're talking about now, or is that something

12 else?

13         MR. DOGALI:  This relates to the non-existent

14 records.  If something should be found and produced in a

15 simple .pdf form, we'll have the same problem.  We won't be

16 able to figure out what they actually did.

17         THE COURT:  I'm not following you.  You're talking

18 about documents that have not yet been produced.

19         MR. DOGALI:  Correct.

20         THE COURT:  Okay.  One ball in the air at a time.

21 They produced -- I issued -- I granted your motion to compel.

22 I said, "Produce documents.  Find and produce."  They found

23 one document.  It's privileged.  They sent you a privileged

24 log.

25         MR. DOGALI:  Correct.

1  THE COURT:  Do you -- do you have an issue with that

2  or not?  In other words, do you think that there are more

3  documents that haven't been found?

4  MR. DOGALI:  Yes.

5  THE COURT:  Okay.  And how are you going to go about

6  either assuring yourself that there are not documents that

7  haven't been found or trying to uncover those documents?

8  What's your proposal?

9  MR. DOGALI:  We have advised defense counsel we'd

10  like to take a deposition of a custodian, which would be

11  fairly common, about how this search was performed.

12  THE COURT:  Okay.  That was going to be my

13  suggestion, but -- so, and then what else would you want

14  to do?

15  MR. DOGALI:  That custodian possibly will be the

16  same one that would relate to the broader production of

17  documents as well.

18  THE COURT:  All right.  So, your next move is to

19  depose a custodian regarding the search that was conducted in

20  order to find documents to comply with my order granting in

21  part your motion to compel?

22  MR. DOGALI:  Correct.  And I believe that witness

23  would be the same one that relates to the previous

24  productions.

25  THE COURT:  Okay.

1    MR. RAWLIN:  So, your Honor, what's happening is

2   the plaintiff doesn't have a case.  They don't like the

3   information they've been given because it disproves their

4   case, and so now they want to make the case about discovery.

5   It's common when a plaintiff doesn't have a case and doesn't

6   have any merit to their claims.

7    We can show what we did to search for these

8   documents.  Now, these documents are from an incident that

9   occurred in 2006, so 12 years ago.

10    THE COURT:  And you want me to adjudicate that right

11   now, whether your search was compliant with your obligations

12   under Rule 34?

13    MR. RAWLIN:  There's no custodian who's going to be

14   able to say, "Here's what we did."  I mean, I can tell the

15   Court what we did.  I talked with over 20 employees of the

16   company in the various relevant areas and instructed them to

17   look for documents.  They searched a bunch of current

18   libraries, current places where documents would be, legacy

19   obsolete databases from when Mentor was a stand-alone company.

20   We pulled --

21    THE COURT:  If you don't want me to adjudicate the

22   sufficiency of your search, why are you telling me this right

23   now?

24    MR. RAWLIN:  Okay.  And maybe that's for further

25   motion.

1    I did prepare a timeline of what happened in 2006

2  that I think would maybe shed light on why there's not more

3  documents, because believe me, I wanted the documents.  When

4  the FDA says, "We conducted a thorough investigation and have

5  cleared Mentor of wrongdoing," I want those documents, right?

6  Those documents are going to help me.

7    And so if you look at what happened in 2006, the

8  employee involved, who we're not disclosing publicly the name

9  because there was an adverse employment action, was notified

10 they were going to be terminated April 24th.  They were

11 terminated on May 31st.  They sent a letter to the FDA only on

12 June 22nd.

13    THE COURT:  That's the employee.

14    MR. RAWLIN:  The employee sent the letter to the FDA.

15 Mentor didn't know that.  So, we have this period of time in

16 months when Mentor has already submitted a bunch -- I mean,

17 millions of pages of things related to its premarket approval

18 for its memory gel implants to the FDA; and the FDA is

19 reviewing that, and its scientists are reviewing that and

20 asking questions.  So, we have this period of months where the

21 FDA is examining that and asking Mentor questions.

22    *Public Citizen* publishes the letter on October 12th,

23 2006, the first time Mentor knows of it.  The next day, the

24 FDA spokesperson is quoted in the Chicago Sun Tribune, I

25 believe, saying --

1       THE COURT:  *Sun-Times* or *Tribune*, not both.

2       MR. RAWLIN:  One of them, saying --

3       THE COURT:  You're from Florida, so that's fine.

4       MR. RAWLIN:  -- "We have conducted a thorough

5   investigation.  We have found no evidence of wrongdoing.  We

6   have found nothing to indicate that the safety of the

7   product" --

8       THE COURT:  You're not from Florida.  He's from

9   Florida.

10      MR. RAWLIN:  I'm from Cleveland.

11      THE COURT:  You're from Cleveland?

12      MR. RAWLIN:  Yes, your Honor.  The next day -- well,

13  how is that possible?  How is that possible the FDA has the

14  letter on June 22nd?

15      Mentor learns of the letter on October 12th, and a

16  bunch of people from Mentor get together and write a memo, the

17  privileged memo to their lawyer four days later on

18  October 16th debunking all of those claims.

19      Well, on the 13th, the FDA is already clearing them.

20  How is that possible?  It's because the FDA, in its own mind,

21  has asked the questions it needs to ask in this period of

22  time; and when Mentor goes to them and tells them, "Hey, we're

23  prepared to tell you what we have found," they go, "Don't

24  worry about it.  We've already done that."

25      I have the letter -- I have the memo.  I'm willing to

1  let the Court look at it *in camera* if you wish.

2      THE COURT:  There's been no challenge as to the

3  assertion of privilege, so there's no reason for me to look at

4  the memo right now.  All there is is a challenge to -- all I

5  hear is the plaintiff saying is, "One document?  That's all

6  you can find?  There's got to be something else."

7      And then plaintiff says, "How am I going to -- the

8  lawyer's telling me there aren't any documents.  So, what do

9  you do in this situation?"  The play you run is you depose a

10  custodian, somebody who has knowledge, could be a 30(b)(6).

11  Somebody who has knowledge of what searches were done and what

12  documents existed at the time and the like.  And again, if

13  it's not one person, there's a rule for that.  It's 30(b)(6).

14      MR. RAWLIN:  Okay.

15      THE COURT:  And that's what you do.

16      MR. RAWLIN:  I understand, your Honor.  I know where

17  this case is going.  This case is going to, "We don't have a

18  case.  We're going to harass you with discovery disputes."

19  That's where this case is going.  And that's unfortunate.

20      The 30,000 pages of information that we produced on

21  the claim that the Court found not preempted, which was:

22  Did Mentor intentionally conceal the true rupture rates of its

23  implants?  We produced a whole bunch of data on exactly what

24  Mentor knew about rupture rates and what it told everyone,

25  including the FDA; and they don't like it because it shows we

1    told them the true rupture rates.  There are rupture rates.

2          And now we're getting -- this is going to turn into

3    discovery motions, repeated serial discovery motions.  That's

4    where this case is going, and I don't think that's what this

5    case should be about.  This case should be about:  Did Mentor

6    conceal rupture rates?  It didn't.  And causation.  Is there

7    any evidence that breast implants caused disease in this

8    plaintiff?  No.  We just deposed the implanter -- the

9    explanter yesterday.  She doesn't believe in this.

10          So, we're going to incur a lot of costs.  I mean, we

11    spent tens of thousands of dollars looking for these documents

12    that don't exist, and now I'm very fearful we're going to

13    spend a whole lot more looking into things that aren't

14    relevant to the case, don't really matter, to get to an

15    inevitable conclusion.

16          THE COURT:  So, let me tell you what's going to

17    happen.  If I agree with you and I say, "Fine.  The plaintiff

18    doesn't have anything.  No more discovery," you move for

19    summary judgment, and I grant it, they're going to appeal.

20    They're going to go upstairs, and three Seventh Circuit judges

21    are going to laugh at me and at you; and it's going to make a

22    very easy day's work for them because it's going to be a very,

23    very easy reversal.  And we're going to be back down here in a

24    year, and I will have wasted your time and your time; and

25    you'd have to end up doing exactly a year from now what the

1 plaintiff is asking you to do right now.

2 It just wouldn't be -- I just can't --

3 MR. RAWLIN: I understand.

4 THE COURT: In a situation like this, I just can't do

5 what you want me to do, and not just because it would waste

6 your time with a reversal upstairs, but it's just not the

7 right thing to do.

8 MR. RAWLIN: I understand, your Honor. We'll go

9 through the process. It's just I can see where the case is

10 going based on the facts and the evidence. Again, we produced

11 the 30,000 pages of things related to what the Court said we

12 needed to produce discovery on, which was: Did Mentor

13 intentionally conceal the true rate of rupture of its implants

14 from doctors and the FDA? So that's what the Court's order

15 was, and we went and produced 30,000 pages of all of these

16 reports and clinical studies --

17 THE COURT: You keep saying 30,000. It doesn't

18 matter because 30,010 could be the document that makes his

19 case. So, the fact that you -- the 30,000 you produced

20 exonerate you is great; but it doesn't -- it's not dispositive

21 because what the plaintiff is saying -- the plaintiffs are

22 saying is that there may be more, and they need to figure out

23 and run the play that one does in this kind of situation to

24 determine whether there are more documents. And I just don't

25 see how under the rules I could say that they're not allowed

1   to do that.

2       MR. RAWLIN:  And that's fine, your Honor.  We'll let

3   that play out.  I'm confident how it's going to play out.

4   That's fine.  We will meet and confer.  Again, last night was

5   the first time I heard that there was an issue with our

6   document production.  We will meet with Mr. Dogali and go from

7   there.

8       THE COURT:  So, why don't we -- you know what you

9   need to do.

10      MR. DOGALI:  I think this custodian has to encompass

11  ESI as well, your Honor, so we'll do that.

12      THE COURT:  You guys can talk about that.  If there's

13  a problem, you can bring it to me.  Otherwise, just go ahead

14  with what you need to do.

15      Why don't we come in for a status hearing, Jackie, in

16  early October.

17      THE CLERK:  How about October 3rd, 9:00 a.m.

18      THE COURT:  Does that work for everybody?  I can give

19  you another date if you'd like.

20      MR. DOGALI:  Your Honor, yesterday defense counsel

21  raised the idea of the current schedule being -- creating

22  restraints.  It set a discovery cutoff of Halloween.

23      THE COURT:  Right.  Why don't we revisit that on the

24  3rd, and I'll be very receptive to a request to adjust the

25  schedule.  I'd like for you -- I don't want to set a date

1  right now when things are up in the air with this custodian

2  issue, so let's let the dust settle on that; and then we'll

3  all -- you'll have a better sense and I'll have a better sense

4  of how much additional time you actually need.

5           MR. RAWLIN:  I'm actually at a deposition in Florida

6  that date, your Honor.

7           THE CLERK:  How about October 2nd?

8           MR. RAWLIN:  I could make that work in the morning.

9           THE CLERK:  October 2nd, 9:00 a.m.

10          THE COURT:  And if any out-of-town counsel would like

11 to call in, you're more than welcome to do so.  You just need

12 to make advance arrangements with Jackie.  All right?

13          MR. DOGALI:  October 2 works.

14          THE COURT:  Thanks a lot.

15          MS. WEISS:  Thank you, your Honor.

16          MR. RAWLIN:  Thank you.

17

18   (Which were all the proceedings heard.)

19                      CERTIFICATE

20   I certify that the foregoing is a correct transcript from

21 the record of proceedings in the above-entitled matter.

22

23 */s/Charles R. Zandi*                    *September 4, 2018*
   _____             _____
24 Charles R. Zandi                    Date
   Official Court Reporter
25