Gravitt v. Mentor Worldwide LLC
Case No. 1:17-cv-5428

# Exhibit "D"

CATHERINE GRAVITT, ET AL. vs MENTOR WORLDWIDE, LLC
Christy Babb on 12/03/2021

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3

 4   CATHERINE GRAVITT and    )
     TRAVIS GRAVITT,          )
 5                            )
          Plaintiffs,         )
 6   vs.                      ) Case No. 1:17-cv-5428
                              )
 7   MENTOR WORLDWIDE, LLC,   )
     a foreign corportation,  )
 8                            )
          Defendant.          )
 9   _____)

10

11       * * * * * * * * * * * * * * * * * * * * * * *

12                         ORAL DEPOSITION OF

13                            CHRISTY BABB

14                      FRIDAY, DECEMBER 3, 2021

15       * * * * * * * * * * * * * * * * * * * * * * *

16

17       ORAL DEPOSITION OF CHRISTY BABB, produced as a

18   witness at the instance of the Plaintiffs, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on Friday, December 3, 2021, from 9:01 a.m. to

21   4:54 p.m., before Cheryl A. Dixon, RPR, CRR, Notary

22   Public, in and for the State of Texas, reported by

23   machine shorthand, at Regus Business Center, 222 West

24   Las Colinas Boulevard, Suite 1650, Irving, Texas, 75039,

25   pursuant to the Federal Rules of Civil Procedure.
```

```
 1                  P R O C E E D I N G S
 2                        --- o0o ---
 3                       CHRISTY BABB,
 4   having been first duly sworn, testified as follows:
 5                        EXAMINATION
 6   BY MS. UBEROI:
 7       Q.   Good morning, Ms. Babb.  I previously
 8   introduced myself.  I'm Barbara Uberoi and I represent
 9   the plaintiffs, Catherine Gravitt and Travis Gravitt,
10   in this case and it's Gravitt versus Mentor Worldwide.
11   During the course of the deposition today it's my
12   opportunity to ask you questions about the case and
13   just learn what you know with respect to that.
14               While asking questions, you know, we
15   just ask that it's important for the court reporter to
16   pause and allow the question to be asked.  During our
17   normal conversation, you know, we just talked freely
18   and sort of interrupt each other but that doesn't come
19   out clearly on the transcript.
20               Do you understand?
21       A.   Yes.
22       Q.   Super.  Another issue is that the court
23   reporter cannot necessarily interpret "yeas," "yeah,"
24   you know, very often because it can be a couple
25   different things, and nods of the head, hand gestures,
```

```
 1   the information.
 2       Q.   So not all information was required?
 3       A.   Correct.
 4       Q.   What was the next step in the process of the
 5   complaint?
 6       A.   We would -- once it was entered into the
 7   database, we would determine reportability to the FDA
 8   and then make that reporting as applicable; and then
 9   once the product was returned, then we would do our
10   product analysis.
11       Q.   And that's when it would go to the product
12   analysis division?
13       A.   That's correct.
14       Q.   And to circle back around, was your role at
15   that time limited to taking information from the
16   product analysis division, summarizing it, and sending
17   it to the -- your clients?
18       A.   Yes.
19       Q.   At any point in time did your role expand?
20       A.   Yes.
21       Q.   Can you give me an approximate date as to
22   when that occurred?
23       A.   I cannot remember.
24       Q.   How did your role expand?
25       A.   I became the product evaluation supervisor.
```

1   Q.   And what did your role as product evaluation
2   supervisor entail?
3   A.   So I would -- I was over the department so I
4   managed the department, so every, you know, role
5   reported to me.
6   Q.   Anything else?
7   A.   Developed procedures and reports and things
8   like that.
9   Q.   Okay.  At any point in time did you actually
10  take calls from consumers?
11  A.   No.
12  Q.   Did you take complaint calls from Mentor's
13  customers?
14  A.   I did not, no.
15  Q.   When you began working with Mentor in 1993,
16  did you continue working there through December 2017
17  without any changes in the company?
18  A.   I left in February of 2017.
19  Q.   Why did you leave Mentor?
20  A.   Our team was let go; the product evaluation
21  team was relocated.
22  Q.   You initially said they were let go.  Does
23  that mean Mentor closed the division?
24            MR. RAWLIN:  Objection, form.  Go ahead.
25            THE WITNESS:  No.  Just they relocated

1  the department to another division of J&J.
2  BY MS. UBEROI:
3       Q.    What division was that?
4       A.    In Juarez, Mexico.
5       Q.    And I take it you decided you didn't want to
6  leave --
7       A.    That's correct.
8       Q.    -- Texas?
9       A.    That's correct.
10      Q.    And what was your role after being a product
11 evaluation supervisor?
12      A.    I became product evaluation manager.
13      Q.    And how did your duties change with that
14 position?
15      A.    I took over post-market surveillance, which
16 is really the only change.
17      Q.    What does post-market surveillance
18 require?
19      A.    It's trending of the complaints.
20      Q.    Meaning would you track the trending
21 information?
22      A.    Correct.
23      Q.    Was the tracking process -- did that entail
24 using the database?
25      A.    Yes.

```
 1   BY MS. UBEROI:
 2        Q.   I'm interested in your understanding.  You
 3   don't have to be a health care provider.
 4        A.   There's many autoimmune diseases.
 5        Q.   There are and can you give us some examples
 6   of one?
 7        A.   Rheumatoid arthritis.
 8        Q.   Okay.  What else?
 9        A.   Lupus.
10        Q.   What else?
11        A.   Fibromyalgia.
12        Q.   Any others?
13        A.   That's it for right now.
14        Q.   Are you aware of any symptoms that are often
15   associated with autoimmune conditions?
16             MR. RAWLIN:  Objection, foundation.
17             THE WITNESS:  I'm not.  I'm not sure.
18   BY MS. UBEROI:
19        Q.   When you were a manager, was -- were there
20   discussions regarding -- strike that.
21             When you were a manager were there
22   discussions within your department regarding reporting
23   autoimmune conditions or related symptoms?
24        A.   Yes.
25        Q.   And do you recall the nature of some of
```

```
 1   those discussions?
 2        A.   No, I don't.
 3        Q.   Do you recall -- were any of those
 4   discussions based on what should be reported to the
 5   FDA?
 6        A.   Yes.
 7             (Exhibit 2 marked.)
 8   BY MS. UBEROI:
 9        Q.   Ms. Babb, I'm going to show you a document
10   that we'll mark as Deposition Exhibit Number 2.  Take
11   a moment and review the document.
12        A.   (Reviewing document.)
13             Okay.
14   BY MS. UBEROI:
15        Q.   When Mentor transferred the complaint
16   department to Mexico, were you offered the option to
17   relocate with the department?
18        A.   No.
19        Q.   Were you offered the option to work in
20   another department?
21        A.   Yes, I could have applied for another job.
22        Q.   Did you look for another position?
23        A.   No.
24        Q.   Why not?
25        A.   Time for a change.
```

1    A.    Yes.

2    Q.    Okay.  During -- prior to 1996, did -- were
3  Mentor silicon gel breast implants reported through a
4  summary reporting approval process?

5             MR. RAWLIN:  Objection, foundation.

6             THE WITNESS:  I don't remember.

7  BY MS. UBEROI:

8    Q.    If we turn to the next page of the letter,
9  there is some handwriting.  Is that your
10 handwriting?

11   A.    No.

12   Q.    Based on your experience and in your role as
13 working in the Mentor complaint department, was a
14 "serious injury" a term of art?

15            MR. RAWLIN:  Objection, form, but go
16 ahead.

17            THE WITNESS:  I don't think I understand
18 the question.

19 BY MS. UBEROI:

20   Q.    Okay.  What was the meaning of "serious
21 injury" with respect to reporting complaints to the
22 FDA?

23            MR. RAWLIN:  Objection, form.
24 Regulation speaks for itself.  Go ahead.

25            THE WITNESS:  We had procedures that

1  would tell us which complaints were considered serious
2  injuries.
3  BY MS. UBEROI:
4      Q.   And which procedure would that be?
5           MR. RAWLIN:  Objection, foundation, if
6  you know.
7           THE WITNESS:  I don't remember.
8  BY MS. UBEROI:
9      Q.   During your -- you mentioned earlier that
10 you would have prepared procedures.  Did you -- was
11 part of preparing those procedures to include the
12 definition of "serious injury"?
13          MR. RAWLIN:  Objection, form.  Go ahead.
14          THE WITNESS:  Yes.
15 BY MS. UBEROI:
16     Q.   And where did you obtain those
17 definitions?
18     A.   From the labeling.
19     Q.   And that was the labeling of the packages?
20     A.   Yes.
21     Q.   And are those abbreviated as PIDs?
22     A.   Correct, product insert data sheet.
23     Q.   Did Mentor began using the ASR reporting for
24 silicon gel breast implants after receiving this
25 letter?

```
 1                THE WITNESS:  I'm not sure.  I don't
 2    know.
 3    BY MS. UBEROI:
 4         Q.   If you would please turn to the Bates stamp
 5    number ending in 631.  The attachment is entitled
 6    "Data Fields for Post-market Spreadsheet Reports."
 7    What is this document used for?
 8         A.   This is how the -- we call it PSR report is
 9    put together; so these are the details that they're
10    wanting on the report.
11         Q.   Are those the fields of data that would be
12    required?
13                MR. RAWLIN:  Objection, the document
14    speaks for itself.  Go ahead.
15                THE WITNESS:  Correct.
16    BY MS. UBEROI:
17         Q.   And if you go down to line number 6 it says
18    "patient problem codes."  What are those?
19         A.   They can be found on 310633.
20         Q.   Oh, I see, okay.  Now what actually are
21    patient problem codes?
22         A.   This is the FDA's, you know, what they
23    provided to us in order to use these codes for any
24    type of complaint that we may receive.
25         Q.   Okay.  Did -- based on the procedure, were
```

1  you supposed to identify the occurrence of every
2  complaint if it was brought to -- listed in a patient
3  problem -- strike that.
4              According to the PSR procedure, were you
5  required to identify the occurrence of any of these
6  complaints if they were brought to your attention?
7              MR. RAWLIN:  Objection, form.  Go ahead.
8              THE WITNESS:  Yes, so every complaint
9  would be listed on the PSR.
10  BY MS. UBEROI:
11      Q.   Okay.  Were there limitations as to whether
12  the patient problems codes had -- strike that.
13              I notice the next page or the second
14  page down is -- lists the device problem codes.  What
15  are those?
16      A.   This is more specific to the device itself
17  versus the patient.
18      Q.   Is there any connection between the device
19  problem codes and the patient codes as far as the
20  reporting process?
21              MR. RAWLIN:  Objection, form.  Go ahead.
22              THE WITNESS:  Not to my knowledge.  We
23  would just list the codes.
24  BY MS. UBEROI:
25      Q.   Okay.  Did reporting patient codes, was that

1   2008 and earlier, were there ever periods where the

2   number of complaint codes that could be inserted into

3   either MedWatch or ASR or PSR, were they ever

4   limited?

5        A.    Not that I'm aware of.

6        Q.    Going back to the complaint codes, you had

7   mentioned that there -- that the FDA provided

8   different items that would -- were required to be

9   reported.  Are those identified in the

10  problem-complaint-codes table?

11              MR. RAWLIN:  Objection, form.  Calls for

12  regulatory opinion, but go ahead.

13              THE WITNESS:  We had our own codes, so

14  we had the different coding system but we utilized

15  theirs for these summary reports.

16  BY MS. UBEROI:

17       Q.    Did Mentor's coding system include all of

18  the patient problem codes in this table?

19       A.    No.

20       Q.    Can you go down and identify which ones were

21  included if we were to start at the top?

22       A.    No, I would have to see that procedure to

23  know.

24       Q.    Okay.  Is the list of those patient problem

25  codes on the Mentor -- prepared by Mentor, are those

```
 1   BY MS. UBEROI:
 2       Q.   I'm sorry, we'll try that again.  Was there
 3   a policy or practice in place at Mentor where Mentor
 4   would not report a patient complaint where there was
 5   no device-related event?
 6            MR. RAWLIN:  Objection, asked and
 7   answered, form of the question.  Go ahead.
 8            THE WITNESS:  We report -- there's many
 9   complaints up here that are not device related,
10   so seroma capsular contracture infection, we report
11   all of that.  We would report all of that.
12   BY MS. UBEROI:
13       Q.   Would you report those when we they were
14   unassociated with what is characterized as a device
15   event?
16            MR. RAWLIN:  Objection, form.
17            THE WITNESS:  Again, if they've got a
18   Mentor device implanted in the body and we get those
19   complaints, we would report it.
20   BY MS. UBEROI:
21       Q.   So let's turn to Bates stamp number 431633
22   in Deposition Exhibit Number 12.  If we go up to that
23   page, it says -- it is an email from yourself dated
24   December 17, 2010.  Do you see that?
25       A.   I do, yes.
```

```
 1        Q.    Okay.  And the subject is "ALCL lymphoma
 2   complaints."  Do you see that?
 3        A.    Yes.
 4        Q.    You signed it.  Is that something you
 5   sent?
 6        A.    Yes.
 7        Q.    Now, the first sentence says "Starting
 8   today, all reported complaints or clinical study AE
 9   reports associated with ALCL, lymphoma, or T-cell
10   lymphoma must be entered as complaints."  What does
11   "AE" mean?
12        A.    Adverse event.
13        Q.    Okay.  Prior to December 17, 2010, did
14   Mentor enter those items as complaints in all
15   circumstances?
16              MR. RAWLIN:  Objection, foundation.
17              THE WITNESS:  I don't remember.
18   BY MS. UBEROI:
19        Q.    Okay.  But you would have been responsible
20   for that decision at the time, wouldn't you?
21        A.    If we received the information from
22   clinical.
23        Q.    What do you mean "if we received the
24   information from clinical"?
25        A.    This is the clinical study and they would
```

1   maintain all of the paperwork for the clinical study.

2   If they receive something that needed a complaint,

3   they would have to forward it to us.

4       Q.    I understand that this is a policy change.

5   Were you responsible for the reporting policies?

6                MR. RAWLIN:  Objection to form.  Go

7   ahead.

8                THE WITNESS:  I was responsible for

9   updating procedures associated with this, yes.

10  BY MS. UBEROI:

11      Q.    Okay.  So in December 17, 2010, the

12  statement "All reported complaints or clinical study

13  AE reports associated with ALCL, lymphoma or T-cell

14  lymphoma must be entered as complaints."  Was that an

15  update to the policy?

16               MR. RAWLIN:  Objection, form as to

17  policy.  Go ahead.

18               THE WITNESS:  No.  This was more

19  internal and letting clinical know they need to

20  forward us those events.

21  BY MS. UBEROI:

22      Q.    Okay.  If you would have updated the policy,

23  would it be found in the procedure 113?

24               MR. RAWLIN:  Objection as to policy.  Go

25  ahead.

```
 1   sentence?
 2        A.    Yes.
 3        Q.    Did -- we talked earlier about Mentor
 4   requiring medical records to confirm a diagnosis.  It
 5   appears that they did require records; is that
 6   correct?
 7              MR. RAWLIN:  Object to form, misstates
 8   the document.  That's not what it says.
 9   BY MS. UBEROI:
10        Q.    What does it say then, Ms. Babb?
11              MR. RAWLIN:  The document speaks for
12   itself.
13   BY MS. UBEROI:
14        Q.    What does your sentence mean there?
15              MR. RAWLIN:  The document speaks for
16   itself.  If you want to read what it says, you can.
17              THE WITNESS:  It says if we get
18   autoimmune-type symptom complaints, then we need
19   medical records showing a diagnosis.
20   BY MS. UBEROI:
21        Q.    Okay.
22              MS. UBEROI:  Could you read that answer
23   back, please.
24              (Record read.)
25   BY MS. UBEROI:
```

```
 1      Q.    Okay.  The next sentence says that it
 2   would -- "In 2013 it was decided by management,
 3   including Dr. Canady, Mentor Medical Director, that
 4   autoimmune-type complaints reported by the patient
 5   without medical records or without the ability to
 6   verify with the patient's physician would not be
 7   deemed reportable to the FDA."
 8                 Do you see that?
 9      A.    Yes.
10      Q.    Did Dr. Canady make that policy?
11            MR. RAWLIN:  Objection, misstates the
12   document.  Go ahead.
13            THE WITNESS:  Per the document, he did.
14   BY MS. UBEROI:
15      Q.    Dr. Canady, in his earlier correspondence,
16   said that you made the policy.
17      A.    I vetted the procedure yes, but the decision
18   to do that was from management.
19      Q.    When you say "management," who else was
20   included along with Dr. Canady?
21      A.    I do not remember.
22      Q.    Was there -- at the time this memo was
23   prepared, was there some type of management group that
24   would deal with issues as they arose?  I think you
25   spoke about something similar in the past?
```