Gravitt v. Mentor Worldwide LLC
Case No. 1:17-cv-5428

# Exhibit "E"

```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2
                    Civil Action No. 1:17-cv-05428
 3

 4
      CATHERINE GRAVITT and TRAVIS
 5    GRAVITT,

 6                   Plaintiffs,

 7    -vs-

 8    MENTOR WORLDWIDE, LLC,

 9                   Defendant.
      _____/
10

11                DEPOSITION OF LETICIA SENA
           ALL PARTICIPANTS VIA REMOTE VIDEOCONFERENCE
12
                       Pages 1 through 185
13

14
                   Wednesday, October 27, 2021
15                    10:00 a.m. - 5:55 p.m.

16

17

18
                   Stenographically Reported By:
19                  LORA LEE KNORR-FIERRO, RPR

20

21

22

23

24
```

 1                THE WITNESS:  Yes, I do.

 2                THE STENOGRAPHER:  Thank you.  You can put

 3        your hand down.  Counsel, I'm going to mute myself

 4        and you can proceed.

 5   Thereupon,

 6                         LETICIA SENA,

 7   having been first duly sworn, was examined and testified

 8   as follows:

 9                      DIRECT EXAMINATION

10   BY MS. UBEROI:

11        Q.    Good morning, Ms. Sena.

12        A.    Good morning.

13        Q.    My name is Barbara Uberoi.  I represent the

14   Plaintiffs, Catherine Gravitt and Travis Gravitt in this

15   matter.  During the course of the deposition today it

16   will be my opportunity to ask you some questions

17   regarding issues involving this case.

18                Your counsel, Dustin Rawlin, will have an

19   opportunity to hear the question.  If he has an option to

20   the form, he may put that on the record.  That just means

21   that he is recording his intent regarding the question,

22   but unless you are directed otherwise, you can go ahead

23   and answer the question.

24                During the deposition I will try to speak

```
 1        Q.   Okay.  So now my question is what does SOP
 2   mean?
 3        A.   That is a standard operating procedure.
 4             MS. UBEROI:  Thank you, Dustin.  I
 5        appreciate it.
 6   BY MS. UBEROI:
 7        Q.   Next, if we go look on the right side, it
 8   looks like an abbreviation for the procedure where it
 9   says SOP and then HS.  Do you know what the HS stands
10   for?
11        A.   No.
12        Q.   And then it says 113.  Is that the specific
13   procedure number?
14        A.   Correct.
15        Q.   Okay.  So on document 113 it has the title
16   "Medical Device Reporting," but that's the particular
17   procedure number under that category; is that correct?
18        A.   Yes.
19        Q.   Okay.  This one is dated in September of
20   2017 -- no.  I'm sorry.  This one says it was issued on
21   November 17, 2000.  Were you working at Mentor at that
22   time?
23        A.   No, ma'am.
24        Q.   Okay.  I just added a number of documents
```

1      A.   No, ma'am.

2      Q.   Thank you.  Actually, I didn't share it.
3 Thank you for answering anyway.  Same thing.  I think
4 it's going to be very quick.

5           (Thereupon, Plaintiff's Exhibit Number 9
6      was marked for identification, which is attached
7      hereto and made a part hereof.)

8 BY MS. UBEROI:

9      Q.   All right.  Actually, it might not be.
10 We're going to mark as Deposition Exhibit Number 9 Bates
11 MG-1001859 through MG-1001885.  The document is entitled
12 "Mentor Operating Procedure SOP-TX-113 Revision R."
13           Ms. Sena, can you see the document?

14     A.   I do.

15     Q.   It's dated September 29th, 2011.  Were you
16 working at Mentor at that time?

17     A.   It's my name there.  I was because when I
18 changed to Mentor, if I remember correctly, I would
19 have -- I started in June 2011, but I was not physically
20 at the site until October.  And, so, probably I was
21 already reviewing documents.

22     Q.   Okay.  If you could just take a quick
23 moment to look at the document that's downloaded, and
24 just tell me if you've seen that document before.

```
 1         A.    Uh-hm.  My name is there.
 2               MR. RAWLIN:  So yes.
 3               THE WITNESS:  Yes.
 4   BY MS. UBEROI:
 5         Q.    Okay.  So do you recall that you had an
 6   opportunity to review this SOPTX-113 in September of
 7   2011?
 8         A.    Yes.
 9         Q.    You did?  Okay.  I see it was originated by
10   Ms. Babb?
11         A.    Yes.
12         Q.    Did you work with Ms. Babb?
13         A.    Yes.
14         Q.    Were you peers or what was your
15   relationship with her employment wise?
16         A.    We were peers, workers.
17         Q.    Okay.  Was she in a different department?
18         A.    Correct.
19         Q.    Okay.  Now, I'd like -- is this SOP-TX-113
20   a common procedure that was used throughout your tenure
21   at Mentor?
22               MR. RAWLIN:  Objection, foundation, but you
23         can answer.
24               THE WITNESS:  Correct, yeah.
```

```
 1   BY MS. UBEROI:
 2        Q.    What I'd like to do is scroll down to --
 3   well, we'll take a look at the purpose of the procedure.
 4   Actually, before we go there, was this your procedure,
 5   you know, required in your department?
 6        A.    Yes.
 7        Q.    Okay.  So if we take a look at the purpose
 8   here, it says, "The purpose of this document is to
 9   establish an effective system within Mentor to comply
10   with global medical device medical reporting
11   requirements."  Do you agree that that was the purpose of
12   the document?
13        A.    Correct.
14        Q.    But it talks about to comply with global
15   device medical regulatory reporting requirements.  Did
16   this SOP apply only to implants manufactured in the Texas
17   facility?
18              MR. RAWLIN:  Objection.  You can answer if
19        you know.
20              THE WITNESS:  If you look at the scope,
21        yes, Mentor Texas.
22   BY MS. UBEROI:
23        Q.    I'm sorry.  Can you repeat your answer?
24        A.    The answer is yes, Mentor Texas.
```

1   Q.   Now, if we look at subsection 4, which is
2   Bates stamped MG-1001860, do you see that that provides a
3   section of definitions?
4   A.   Correct.
5   Q.   And is it correct that these particular
6   definitions would relate to FDA medical reporting?
7   A.   Yes.
8   Q.   Okay.  Section 4.1.2 says, "Information
9   that would reasonably suggest a reportable event
10  occurred."  Was this the policy that complaint processors
11  would use to determine whether a medical -- or were
12  supposed to use to determine whether a reportable event
13  occurred; do you know?
14  A.   The definition in there is yes.
15  Q.   Okay.  Was it supposed to be relied on by
16  the complaint processors?
17          MR. RAWLIN:  Objection, foundation.
18          THE WITNESS:  I don't understand that
19      question.  Can you repeat it, please?
20  BY MS. UBEROI:
21  Q.   Sure.  Let me step back A little bit.  Who
22  is SOP-TX-113 distributed to?
23          MR. RAWLIN:  Objection, foundation.
24          THE WITNESS:  It would be mainly the

```
 1              responsibility of the Product Evaluation Team.
 2     BY MS. UBEROI:
 3         Q.    Okay.  So it's the Product Evaluation Team?
 4         A.    Correct.
 5         Q.    All right.  Is Gabriel the head of the
 6     Product Evaluation Team?
 7         A.    Not at that particular time.
 8         Q.    He wasn't?  Was he a member of the team?
 9         A.    No.
10         Q.    Was Ms. Babb a member of the team?
11         A.    Correct.
12         Q.    Do you know whether she was the head of the
13     team or not?
14         A.    Yes, she was.
15         Q.    Okay.  Now, based on that, with the product
16     evaluation team, according to this document, was this
17     document to determine the information that would suggest
18     a reportable event had occurred?
19               MR. RAWLIN:  Objection, foundation.
20               THE WITNESS:  Yes.  They would be the ones
21     deciding based on the information, yes.
22     BY MS. UBEROI:
23         Q.    Okay. Super.  Thank you.  So under section
24     4.1.2, the last line, it says, "The source of this
```

```
 1          A.   Correct.
 2          Q.   Any component of compliance required that
 3   you understand was used to determine whether a reportable
 4   event occurred?
 5          A.   Correct.
 6          Q.   Yes, it would be?
 7          A.   It would be, yes.
 8          Q.   Okay.  So if we could go back, is it
 9   correct that to determine whether a reportable event
10   occurred information could come from, you know, medical
11   or scientific literature?
12          A.   Yes.
13          Q.   Okay.  And information could come from
14   Mentor's research testing evaluation service or
15   maintenance of its devices.
16          A.   Yes.
17          Q.   Okay.  Along those same lines, would it be
18   correct that a person could see a product compliant
19   analysis communications or documentation to determine
20   whether a reportable event occurred?
21          A.   Yes.
22          Q.   What is a user or distributor report?
23               MR. RAWLIN:  Objection, foundation.  If you
24   know.
```