Gravitt v. Mentor Worldwide LLC
Case No. 1:17-cv-5428

# Exhibit "Y"

1

```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
                              EASTERN DIVISION
```

| | |
|---|---|
| CATHERINE GRAVITT and TRAVIS GRAVITT, | ) ) ) |
| Plaintiffs, | ) ) ) |
| -vs- | ) Case No. 17 C 5428 ) |
| MENTOR WORLDWIDE, LLC, a foreign corporation, | ) ) ) Chicago, Illinois |
| Defendant. | ) July 18, 2019 ) 9:15 a.m. |

```
                          TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE GARY FEINERMAN
```

APPEARANCES:

For the Plaintiffs:     DOGALI LAW GROUP, P.A.
                        BY: MR. ANDY DOGALI
                        401 East Jackson Street
                        Tampa, Florida  33602
                        (813) 289-0700

                        LENZE LAWYERS, PLC
                        BY: MS. JENNIFER A. LENZE
                        1300 Highland Avenue, Suite 207
                        Manhattan Beach, California  90266
                        (310) 322-8800

                        THE FINSON LAW FIRM
                        BY: MR. LOWELL W. FINSON
                        126 Westwind Mall
                        Marina Del Ray, California  90292
                        (602) 377-2993

Court Reporter:

                        CHARLES R. ZANDI, CSR, RPR, FCRR
                              Official Court Reporter
                           United States District Court
                        219 South Dearborn Street, Room 2128
                            Chicago, Illinois  60604
                          Telephone:  (312) 435-5387
                      email: Charles_zandi@ilnd.uscourts.gov

```
 1  APPEARANCES:  (Continued)

 2  For the Defendant:     TUCKER ELLIS, LLP
                           BY:  MR. DUSTIN B. RAWLIN
 3                         950 Main Avenue
                           Suite 1100
 4                         Cleveland, Ohio  44113
                           (216) 592-5000
 5

 6                         TUCKER ELLIS, LLP
                           BY:  MS. BRITTANY L. WEISS
 7                         233 South Wacker Drive
                           Suite 6950
 8                         Chicago, Illinois  60606
                           (312) 624-6300
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1 the second bucket being the idea that they are unilaterally
2 constricting the time that we think is relevant, life of the
3 product, as your Honor put it.
4 They're arbitrarily setting the 2005 date because
5 Ms. Gravitt had one of her implants created in 2005. She had
6 those implanted in 2009 with warnings that were created from
7 back in 1984 when the product came into existence, meaning it
8 was through -- from 1984 until they put together their PMA in
9 2003 that the rupture rates and the information to create that
10 rupture rate was gathered.
11 It was gathered through studies. It was gathered
12 through complaints that were all requirements of this
13 manufacturing company to collect and analyze through failure
14 modes, through analysis of the studies, and so forth. The
15 core study, for example, was what they relied on to come up
16 with the rupture rates in the PMA. That started in 2000.
17 And defense likes to point out that we have a single
18 claim left, a single claim for failure to warn of rupture rate
19 and seepage. But that single claim, it goes -- it's not
20 narrow in terms of time because these were issues -- ruptures
21 have been issues analyzed by this company from the very
22 beginning, even in terms of the type of shell they used and --
23 because the thinner shell tended to rupture more often. They
24 came up with a thicker shell.
25 With regards to their studies, even as far back as

1   2000 and before, the adjunct study, the core study, there was
2   concern about rupture.  It's why the FDA required long-term
3   studies to focus on not only rupture, but causation, which is
4   another thing we have to prove in this case, between what
5   happens after rupture.  Now there's silicone in a woman's
6   body.  Does it or does it not cause issues that our plaintiff
7   has?  And these are all things being analyzed from 1984 to
8   2003, really, when they submitted their PMA.
9           Now, back in 2001, I believe it is -- or excuse me,
10  back in the '90s, it was '91, Mentor submitted their first
11  PMA, but the FDA said, "No, no, no, Mentor.  This is not good.
12  We don't trust the safety of this product.  Go back and try
13  again."  One of the issues the FDA had in their first
14  submission in '91 was issues with rupture.
15          And so I feel like plaintiffs are going to be cut off
16  at their knees if we're not able to go as far back as that and
17  determine what this company was looking at, how they came up
18  with these numbers that they submitted in 2003, including
19  things the whistleblowers talked about, studies, complaints,
20  everything that formulated the numbers they submitted in 2003.
21  We would -- it is our case.  It's our whole entire case.
22          With regards to the complaint files, I find it almost
23  shocking that Mr. Rawlin says we haven't fully explained why
24  we need complaint files.  ==If our sole cause of action is==
25  ==failure to warn about the rupture rate, that rupture rate is==

1  formed not just from these studies, but from complaints that
2  individuals submit not to the FDA, necessarily, but those have
3  to be analyzed as well, but to the company directly.
4  　　　　　And what we've seen in not just this case, but in
5  multiple products cases, multiple pharma cases, is that the
6  critical question, the analysis when that complaint comes in,
7  was that cause related to this product?  And that analysis is
8  in the exclusive hands of the defendant.  They are the only
9  people that get to decide whether it rises to the level of
10 something submitted to the FDA.
11 　　　　　And so these summary reports that they're talking
12 about, not only are they already public record so we don't
13 even need to ask the defendants for those; but these summary
14 reports are only those complaints that have already risen to
15 the level of an MDR, of something that they have made the
16 determination is connected to that product.
17 　　　　　But what we're saying, they concealed a whole host of
18 other complaints that they decided did not rise to the level,
19 and that's what our experts need to prove our case.  That's
20 what we need through discovery.  Whether it's admissible or
21 not is a question for another day.  It's absolutely relevant.
22 　　　　　And whether it's proportional, you know, I feel like
23 in analyzing and looking at the cases dealing with
24 proportionality, not only did it exist prior to the 2015
25 amendment, so it's always been there, just changed positions,

1   if you will; but what I've found the courts to really say is
2   that proportionality kind of deals with when you're at the
3   point of diminishing return.  Is there -- have you dealt with
4   discovery that supported your case and now whatever party is
5   looking for something that is like the hope of turning up
6   something.
7            This is not that.  This is discovery to the very core
8   of our complaint, and so I feel like the proportionality issue
9   is not a good faith one at this juncture.
10           With regards to confidentiality, we have a
11  confidentiality agreement in this --
12           THE COURT:  I thought we dealt with this last June.
13           MR. RAWLIN:  Multiple times.
14           THE COURT:  We dealt with this last June, where the
15  plaintiffs' side agreed that the regulation doesn't -- there's
16  no confidentiality order exception to the regulation.  So, for
17  Mentor to hand it over to the plaintiffs, even if it's
18  attorneys' eyes only, it has to be in redacted form.
19           MS. LENZE:  Sure.  And that's fine, your Honor.  In
20  their opposition, defendants mention the fact that -- you
21  know, say, "There's a thousand complaints.  It's going to take
22  us X amount of days."
23           There's ESI -- and our ESI folks have done the same
24  in other cases.  There's ESI tools to use for redactions and
25  for -- you know, to streamline the process, to deal with the